**In the Matter of the TAX LIABILITIES OF: JOHN DOES, ALL UNKNOWN EMPLOYEES OF BOUNDARY WATERS RESTAURANT 12422 Wayzata Boulevard Minnetonka, Minnesota for the Calendar Year 1984, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

**No. 87–5237 MN.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 9, 1988.

Decided Jan. 27, 1989.

David R. Brennan, Minneapolis, Minn., for plaintiff-appellant.

William A. Whitlede, Justice Dept., Washington, D.C., for defendant-appellee.

Before HEANEY and MAGILL, Circuit Judges, and FAIRCHILD *, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

The United States, having obtained leave of court, served a John Doe summons on Dayton Hudson Corporation (Dayton) requiring the production of records of Boundary Waters Restaurant for the year 1984. Boundary Waters Restaurant, Minnetonka, Minnesota, represents a small portion of Dayton's business. The records (described in more detail in the summons) would reflect sales, employee identities, hours worked, tips reported by each employee, and retained copies of Forms W–2 and W–3.

Dayton has appealed from an order denying Dayton's motion to quash the summons, and having the effect of enforcing the summons.[1]

Because the summons was a so-called John Doe summons, *i.e.*, did not identify the persons with respect to whose liability it was issued, the government was required to comply with 26 U.S.C. § 7609(f), originally created in 1962.[2]

Subsection (f) provided that the summons may be served only after a court proceeding in which the Secretary establishes that—

---

* The Honorable Thomas E. Fairchild, Senior United States Circuit Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation.

1. The order did not expressly direct Dayton to comply with the summons. It was entered, however, after a hearing on an order to show cause "why the summons should not be enforced." Dayton moved for a stay, and in grant- ing the stay, the court described the order appealed from as having "enforced the petition of the United States for the enforcement of a summons." Both parties have treated the order as one for enforcement and say we have jurisdiction under 28 U.S.C. § 1291. We deem the order final.

2. Pub.L. 94–455, Title XII, § 1205(a).

(1) the summons relates to the investigation of a particular person or ascertainable group or class of persons,

(2) there is a reasonable basis for believing that such person or group or class of persons may fail or may have failed to comply with any provision of any internal revenue law, and

(3) the information sought to be obtained from the examination (and the identity of the person or persons with respect to whose liability the summons is issued) is not readily available from other sources.

Section 7609(h)(2) provides that the determinations under (f) "shall be made ex parte and shall be made solely on the petition and supporting affidavits."

The government filed a petition for leave and a supporting declaration signed by IRS tax examiner MacMillan, "under penalty of perjury." These documents showed:

(1) IRS had begun an investigation to determine the correct tax liabilities and the correctness of the returns of the tipped employees of Boundary Waters Restaurant for 1984. (It later appeared that the employees numbered 50.)

(2) A 1982 Senate Report indicated a 16% compliance rate in reporting tip income in 1981. Investigation of 28 restaurants in Minnesota for 1984 showed that at 17, or nearly 61%, there were employees who underreported tip income. A total of 146 employee tax returns required adjustment.

(3) The identities of the tipped employees of Boundary Waters during 1984 and the other records sought are not readily available from other sources.

The district court[3] entered an order determining that the summons related to the examination of an ascertainable group of persons; that there is a reasonable basis for believing that they may have failed to comply with the Internal Revenue Code; and that the information sought and the identities of the employees are not readily available from other sources. The court

permitted service of the summons and directed Dayton, if it objected, to show cause on May 8, 1987 why the summons should not be enforced.

Dayton objected and moved to quash the summons. After the hearing the court stated that there was a legitimate purpose for the summons and then entered the order appealed from.

## I. PURPOSE OF SUMMONS

Dayton's principal argument appears to be that IRS is using the summons to gather data for a study and not for the purpose of carrying on an investigation of taxpayer liability.

Dayton relies on *United States v. Humble Oil & Refining Company*, 488 F.2d 953 (5th Cir.1974), vacated and remanded for further consideration in light of *United States v. Bisceglia*, 420 U.S. 141, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975), *United States v. Humble Oil & Refining Company*, 421 U.S. 943, 95 S.Ct. 1670, 44 L.Ed.2d 97 (1975), opinion on remand 518 F.2d 747 (5th Cir.1975). In *Humble*, the Fifth Circuit considered a summons issued to an oil company seeking information concerning some 100 to 200 mineral rights lessors. The court characterized the project as *"research concerning noncompliance"* and noted that the lessors were not "the object of any *investigation* for noncompliance with the tax laws." 488 F.2d at 954. On remand from the Supreme Court, the Fifth Circuit decided that *Bisceglia* did not require reversal and adhered to its distinction between a research project from which adjustment of tax liabilities would only incidentally result, and an ongoing investigation. Language in the earlier opinion seems to have acknowledged that the summons power could be used "when IRS scrutiny of a taxpayer or a group thereof becomes particularized or focused." 488 F.2d at 960.

Dayton contends that the purpose of the present summons is to obtain data for a study.[4] The government concedes in its

---

3. The Honorable Paul A. Magnuson, District Judge, District of Minnesota.

4. Apparently the reference is to § 314(c) of Pub. L. 97–248 (1982):

brief that "[t]he Internal Revenue Service also intended to include the information derived from the investigation in a study about the underreporting of tip income."

The Fifth Circuit has given *Humble* a narrow interpretation.

The essence of the *Humble* holding, thus, was not that a summons could not be enforced where the investigation of a taxpayer's return was conducted primarily for research, but rather was that a particularized investigation (based on specific facts or specific taxpayers) was there non-existent....

Thus, the IRS may issue summonses for research purposes as long as the summons is based in good faith upon a section 7602 purpose, even though motivated more generally by an investigative or research purpose within the contemplation of section 7601.

*United States v. First Nat. Bank in Dallas,* 635 F.2d 391, 395–96 (5th Cir.1981), *cert. denied sub nom. Yeoham v. United States,* 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981).

This court has upheld the use of a § 7602 summons for the purpose of ascertaining the correctness of a taxpayer's return, even if the "primary" purpose were to gain research data. *U.S. v. Flagg,* 634 F.2d 1087, 1091 (8th Cir.1980).

Accordingly, the district court was not called upon to decide which of two purposes was primary, but only whether one good faith purpose was to investigate taxpayer liability.

The decision in *Humble* preceded the enactment of 26 U.S.C. § 7609(f). This court has decided

> that the criteria for the service of a third-party, John Doe summons under section 7609(f) cannot be collaterally challenged

during proceedings to enforce the summons.... Allowing reconsideration of the section 7609(f) determinations during a summons enforcement action would subject those determinations to adversarial attacks inconsistent with the ex parte nature of the proceedings expressly created by Congress.

*United States v. John G. Mutschler & Assoc., Inc.,* 734 F.2d 363, 366 (8th Cir. 1984).

■ Applying that holding to the present case, the district court's determination that the summons relates to the investigation of a particular ascertainable group of persons, 26 U.S.C. § 7609(f)(1),[5] was not open to collateral attack, and places this inquiry on the investigation side of the investigation—research distinction drawn in *Humble.*

In *Mutschler,* this court went on to say

> Of course, nothing in our decision restricts the scope of review during summons enforcement proceedings established in *Powell.* The IRS must make out a prima facie case of good faith establishing "that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed." *United States v. Powell, supra,* 379 U.S. [48] at 57–58, 85 S.Ct. [248] at 254–255 [13 L.Ed.2d 112 (1964)]. Besides these four specific prima facie elements, the *Powell* Court made clear that a court asked to enforce an IRS summons may "inquire into the underlying reasons for the examination" in order to prevent an abuse of the judicial process. *Id.* at 58, 85 S.Ct. at 255. Once the IRS makes out a prima facie

The Secretary of the Treasury or his delegate shall submit before January 1, 1987, to the Committee on Ways and Means of the House of Representatives and to the Committee on Finance of the Senate a report with respect to tip compliance in the food and beverage service industry. Such study shall include, but not be limited to, an analysis of tipping patterns, tip-sharing arrangements, and tip compliance patterns.

We have been informed that the study is still proceeding.

5. We note that the court used the word "examination" rather than the statutory term "investigation" in its order, but in context, including the court's finding of "legitimate purpose" we attach no significance to the difference.

case under the four express *Powell* standards, the burden shifts to the party summoned "to disprove one of these elements or to demonstrate that judicial enforcement of the summons would otherwise constitute an abuse of the court's process." *United States v. Lask*, 703 F.2d 293, 297 (8th Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 104, 78 L.Ed.2d 107 (1983).

734 F.2d at 367.

■ Assuming, accordingly, that it was left open to Dayton to prove that the government's representation that the IRS was conducting an investigation to determine the correctness of the 1984 returns and the tax liability of the 50 Boundary Water employees was a sham and a false pretense, we do not deem the district court's finding of legitimate purpose clearly erroneous.

Dayton showed that in March, 1986, Mr. MacMillan had informed Dayton that Boundary Waters had been selected as a sample establishment for the study of tip income reporting compliance and had requested Dayton to produce much the same records as now at issue. Dayton had declined.

The district court did not comment on this earlier request. We note that the government's petition was signed February 9, 1987, more than ten months after the informal request. The study may well have proceeded in the interim. The examiner's declaration cited information of underreporting obtained in the study and other investigations as a reasonable basis for believing that Boundary Waters employees may have underreported. We conclude that under thse circumstances, the fact of the earlier request for material to be used in a study did not compel a finding that the claim of an investigation into tax liabilities was a sham.

## II. DISCOVERY

■ Upon receipt of the summons, Dayton had requested the government to produce documents, under Rule 34, F.R.Civ.P. The request sought, generally, communications between the national office of IRS and the District Director at St. Paul relating to the study of tip compliance and the use of a summons against Dayton. Doubtless the hope was to find support for the theory that the assertion of an investigation into the correctness of the returns of the Boundary Waters employees was a sham. Dayton made a motion that the court shorten the time for response so that the material must be produced before the May 8 hearing. The government made a motion for an order preventing discovery. In the order appealed from, the court denied both motions as moot.

Dayton contends that it was an abuse of discretion not to permit discovery.

There are, however, limitations on discovery peculiar to this type of proceeding. The Supreme Court and this court have recognized that a district court may limit discovery in IRS summons enforcement proceedings. *Donaldson v. United States*, 400 U.S. [517] at 528–29, 91 S.Ct. [534] at 541 [27 L.Ed.2d 580 (1971)]; *United States v. Lask*, 703 F.2d at 300; *United States v. National Bank*, 622 F.2d 365, 367 (8th Cir.1980) (per curiam); *United States v. Moon*, 616 F.2d [1043] at 1047 [(8th Cir.1980)]. "There is no unqualified right to pretrial discovery in a proceeding to enforce an IRS summons and, indeed, discovery is the exception rather than the rule.... An application of discovery rules which would destroy the summary nature of enforcement proceedings is not required." *Id.* at 1047. The taxpayer must make a substantial preliminary showing of abuse of the court's process before even limited discovery need be ordered. *United States v. Lask*, 703 F.2d at 300; *United States v. Moon*, 616 F.2d at 1047.

*United States v. Claes*, 747 F.2d 491, 496 (8th Cir.1984), (quoting *United States v. Moon*, 616 F.2d 1043, 1047 (8th Cir.1980)).

Dayton suggests an inference that IRS was not really conducting an investigation of tax liability, drawn from the fact that Mr. MacMillan, who signed the declaration in this proceeding, had earlier informally requested the information for a study. Mr. MacMillan was present at the hearing and

Dayton was offered the opportunity to examine him, but declined. Mr. MacMillan had personal knowledge of the circumstances and his motivation for the earlier request as well as his current declaration and must have been aware of some or perhaps all the communications Dayton described to the extent they existed. Examining him would have given the court substantial additional information on which to base its exercise of discretion. Considering the intended summary nature of the proceeding, we think that Dayton, having failed to explore the source of information at hand, cannot claim an abuse of discretion in denying its requested discovery, with its resulting delay.

## III. LIMITATION ON EXAMINATIONS OF A TAXPAYER

26 U.S.C. § 7605(b) provides:

No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

Dayton asserted that it was currently under examination by IRS with respect to its own tax returns for periods that include 1984. It argues that § 7605(b) forbids this "second" examination under the summons procedure.

The summons here is not directed at Dayton qua taxpayer, but as a third party having records relevant to the liability of a taxpayer. Many years ago, responding to a similar contention, this court said, "We think the short answer, so far as § 7605(b) is concerned, is that Bouschor [a third party] is not the person protected by the statute...." *Bouschor v. United States*, 316 F.2d 451, 457 (8th Cir.1963).

## IV. THE BURDEN OF COMPLIANCE

Dayton emphasizes the difficulties it will encounter in locating and presenting the records sought by the summons. An affidavit by its director of income tax asserts (1) the payroll records are commingled with other payroll records of its Department Store Division and it will take one person four to six weeks, or possibly twice that, to segregate the records sought; (2) that the daily sales summaries are located on pallets and will require two weeks; and (3) the charge receipts are on microfiche at another location and intermingled with other charge receipts, so that it would take one person from three to nine months to segregate and make copies. One person's salary rate is $19.23 per hour, for a total ranging from $13,845 to $38,460.

The government offered, on the other hand, "to do a lot of the leg work" and there is provision for at least partial compensation (although Dayton deems it inadequate).

Dayton argues that the burden of its compliance is so great in proportion to any revenue the IRS may obtain (perhaps $500 as to each employee who underreported tips) that the summons is unreasonable and should not be enforced.

Dayton concedes that

The Supreme Court has treated the Fourth Amendment protections available to corporations as being essentially whether the search is reasonable. *Oklahoma Press Publishing Company v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946).

The cases, however, leave little room for the proposition that the burden of locating relevant documents is to be weighed against the possible recovery of revenue in determining whether the summoning of corporate documents under 26 U.S.C. § 7602(2) is unreasonable.

*Walling*, itself, says that once it be determined that the investigation is for a lawfully authorized purpose and the documents sought are relevant to the inquiry, "the requirement of reasonableness ... comes down to specification of the documents to be produced adequate, but not excessive, for the purpose of the relevant inquiry." 327 U.S. at 209, 66 S.Ct. at 506.

Although a governmental investigation into corporate matters may be of such sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power ..., it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.

*United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401 (1950).

This court has held "[b]roadness alone is not sufficient justification to refuse enforcement of a subpoena so long as the material sought is relevant." *Adams v. F.T.C.*, 296 F.2d 861, 867 (8th Cir.1961), *cert. denied*, 369 U.S. 864, 82 S.Ct. 1029, 8 L.Ed.2d 83 (1962), *quoted with approval United States v. Giordano*, 419 F.2d 564 569 (8th Cir.1969).

Although statements can be found that a district court may refuse to enforce a summons which is excessively burdensome, *United States v. Davey*, 543 F.2d 996, 1000 (2d Cir.1976), or "out of proportion to the end sought," *United States v. Harrington*, 388 F.2d 520, 523 (2d Cir.1968), the only case cited by Dayton where enforcement was refused because of disproportion between the economic burden on the corporation summoned and the expected benefit to IRS was *United States v. Third Northwestern Nat. Bank*, 102 F.Supp. 879 (D.Minn.1952). The summons was directed to a bank. Compliance would require the bank to examine many thousands of items looking for one of thirteen names. One of the names was that of Brennan, the taxpayer who was the object of the investigation. Brennan had had one transaction with the bank, a loan on his car, and there had been a loan to one of the others. There was no account in any of the names and no other known transactions. The only theory upon which the IRS could hope to obtain information relevant to Brennan's tax liability was that Brennan may have used the other names as aliases or as agents or nominees. The court found no evidence to justify that suspicion.

Without considering the merits of the *Third Northwestern* rationale, the case is readily distinguishable on its facts.

The district court did not comment nor make a finding on Dayton's claim that the summons imposed an excessive or disproportionate burden, but evidently was unpersuaded. In our view the facts relied on by Dayton, mitigated by the government's offer of assistance and the compensation to which Dayton is entitled, do not compel a finding sustaining the claim.

## V. INFORMATION IN COMMISSIONER'S POSSESSION

■ One of the specific elements which must be established under *United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–255, 13 L.Ed.2d 112 (1964) is that the information sought is not already within the Commissioner's possession. Dayton argues that the identities of the Boundary Waters employees are on file with the IRS. Dayton showed that it had filed the appropriate IRS Forms W–3, 8027 and copies of Forms W–2. The 8027 form would have reported the identities of the employees, as required by 26 C.F.R. 31–6053(a), and would presumably be indexed under Dayton's or Boundary Waters' name. Other records, however, were also sought. These would disclose sales and the hours worked. They were clearly needed for the success of the investigation. The identities of the employees would enable the IRS to locate their returns, but the other records would still be required in order to determine whether the returns were correct, and there is no claim that these other records are already in the Commissioner's possession.

## VI. RATE OF COMPENSATION

■ In 1976, Congress enacted 26 U.S.C. § 7610. It provided compensation for the person summoned when that person's liability was not at issue and the records were not the property of the person whose liability was being investigated. Subsection (a) provided:

The Secretary shall by regulations establish the rates and conditions under which payment may be made of—

(1) fees and mileage to persons who are summoned to appear before the Secretary, and

(2) reimbursement for such costs that are reasonably necessary which have been directly incurred in searching for, reproducing, or transporting books, papers, records, or other data required to be produced by summons.

The Treasury responded by adopting 26 C.F.R. § 301.7610–1. Under Subsection (c)(1),

No payment will be made until the third party has satisfactorily complied with the summons and has submitted an itemized bill or invoice showing specific details concerning the costs to the Internal Revenue Service employee before whom the third party was summoned.

The parties agree that payment in advance is not required.

Our problem arises because Subsection (c)(2)(i)(A) establishes a rate for search costs: "For the total amount of personnel time required to locate records or information, $8.50 per person hour for summonses issued after July 19, 1983."

Dayton, however, made a showing that its personnel time will cost $19.53 per hour, and the total may run from $13,845 to $38,460, with the corresponding reimbursement under the regulation being limited to $6,120 and $17,000. The government suggests that it is not reasonably necessary to have a $19.53 per hour employee perform the search. It also indicates that the total time estimated can be reduced through the use of IRS employee assistance, which it has offered to provide.

The district court indicated some concern about the net cost, but observed that excess of cost over allowance is not unusual, and declined Dayton's request to order reimbursement at the rate of $19.23 per hour. We also decline.

Third-party record keepers have a general duty to respond to a government summons and legitimately may be required to shoulder some economic burden in doing so.... However, a court ordering judicial enforcement of an administrative summons has discretion to set appropriate limitations on compliance to protect a respondent from oppressive procedures and excessive expense.

*United States v. Southwestern Bank & Trust Co.*, 693 F.2d 994, 996 (10th Cir. 1982).

More recently the Tenth Circuit has decided that 26 U.S.C. § 7610 did not withdraw from the federal courts their jurisdiction to review IRS reimbursement rates. *United States v. Community Bank and Trust Co.*, 768 F.2d 311, 314 (10th Cir. 1985). The court upheld an allowance of $10 per hour, lower than the full cost to the person summoned, but greater than the rate then allowed by the regulation.

We would be concerned about the reasonableness of forcing Dayton to spend $20,000 of its own resources, over and above the compensation it would receive at $8.50 per person hour, Dayton's worst case scenario. On the other hand, the district court may have been skeptical, as we are, whether anything approaching that amount will be needed if Dayton makes a good faith effort to reduce its cost by using lower paid employees and by using the assistance IRS has offered. The best Dayton can ask for is to have the district court retain jurisdiction to consider the matter of expense after a reasonable effort has been made and then in its sound discretion to grant relief, if necessary, to avoid a grossly excessive net expense to Dayton.

The order appealed from is MODIFIED so that the district court will retain jurisdiction, consistent with this opinion, and as so modified, it is AFFIRMED. Costs on appeal are awarded to the United States.